Case 8:21-mj-00319-DUTY *SEALED*   Document 2 *SEALED*   Filed 05/05/21   Page 1 of 23
Page ID #:46

AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means (USAO rev. 12/20)      ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>Black iPhone 11 Pro, with Serial Number MWA62LL/A, and International Mobile Equipment Identity C35CX86RN6XM | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 8:21-MJ-00319-DUTY |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

*See Attachment B*

Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

You must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.</u>

Date and time issued:   <u>May 5, 2021, 3:15 p.m.</u>                    *Karen E. Scott*
                                                                     *Judge's signature*

City and state:     <u>Santa Ana, CA</u>                        Karen E. Scott, U.S. Magistrate Judge
                                                                     *Printed name and title*

AUSA: Jake D. Nare, 213-393-5497

AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>8:21-MJ-00319-DUTY | Date and time warrant executed:<br>5/18/21 @ 05:00 pm | Copy of warrant and inventory left with:<br>Det. J. Saar (CMPD) |
| Inventory made in the presence of :<br>SA Ronald Saar | | |
| Inventory of the property taken and name of any person(s) seized: | | |

1) 1 Black iphone 11 Pro
   SN: MWA62LL/A
   IMEI: C35CX8GRN6XM

| Certification |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 5/18/21

_Executing officer's signature_

RONALD J. SAAR, Special Agent
_Printed name and title_

## **ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following digital device (the "SUBJECT DEVICE") seized on or about February 20, 2021, and currently maintained in the custody of the Costa Mesa Police Department at its office in Costa Mesa, California: a Black iPhone 11 Pro, with Serial Number MWA62LL/A, and International Mobile Equipment Identity ("IMEI") C35CX86RN6XM.

**ATTACHMENT B**

I.  **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances) and 846 (Conspiracy to Distribute Controlled Substances) (the "Subject Offenses"), namely:

a.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

b.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

c.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

     d.    Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

     e.    Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

     f.    Contents of any calendar or date book;

     g.    Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

     h.    Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

     i.    With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

        i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

        ii.   evidence of the presence or absence of software that would allow others to control the device, such as

iii

viruses, Trojan horses, and other forms of malicious software,
as well as evidence of the presence or absence of security
software designed to detect malicious software;

   iii. evidence of the attachment of other devices;

   iv. evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

   v. evidence of the times the device was used;

   vi. passwords, encryption keys, and other access
devices that may be necessary to access the device;

   vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

   viii. records of or information about
Internet Protocol addresses used by the device;

   ix. records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

  2. As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

II.   **SEARCH PROCEDURE FOR THE SUBJECT DEVICE**

3.   In searching the SUBJECT DEVICE (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICE as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or

v

encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

    ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

    iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

    e.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

    f.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

    g.   If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

    h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies

of the digital device, but may not access data falling outside
the scope of the other items to be seized (after the time for
searching the device has expired) absent further court order.

   i. The government may also retain a SUBJECT DEVICE
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been
able to fully search a device because the device or files
contained therein is/are encrypted.

   j. After the completion of the search of the SUBJECT
DEVICE, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

   4. The review of the electronic data obtained pursuant to
this warrant may be conducted by any government personnel
assisting in the investigation, who may include, in addition to
law enforcement officers and agents, attorneys for the
government, attorney support staff, and technical experts.
Pursuant to this warrant, the investigating agency may deliver a
complete copy of the seized or copied electronic data to the
custody and control of attorneys for the government and their
support staff for their independent review.

   5. The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not

apply to any search of digital devices pursuant to any other

court order.

Case 8:21-mj-00319-DUTY *SEALED*   Document 2 *SEALED*   Filed 05/05/21   Page 11 of 23
Page ID #:56

## **AFFIDAVIT**

I, Ronald J. Saar, being duly sworn, declare and state as follows:

### **I.    INTRODUCTION**

1.    I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), an agency of the U.S. Department of Justice.  I have been so employed since December 2020.  I am currently assigned to Los Angeles Field Division ("LAFD") Orange County District Office ("OCDO").  At the OCDO, I am assigned to Enforcement Group-III ("ENF-III"), Los Angeles Field Division. ENF-III specializes in Counter-Narcotic Cyber and Dark-Web investigations.

2.    I have received specialized training concerning violations of the Controlled Substances Act contained within Title 21 of the United States Code, while in the DEA Academy located in Quantico, Virginia.  I have also participated in several narcotics investigations as a Special Agent.  I have debriefed defendants and witnesses who had personal knowledge of major narcotics trafficking organizations.  Additionally, I have participated in many aspects of narcotics investigations including conducting physical surveillance, executing search warrants, and conducting arrests.  Based on my training and experience, I am familiar with narcotics traffickers' methods of operation including the distribution, storage, and transportation of narcotics and the collection of money proceeds of narcotics trafficking.  In addition, I received training in, and I am familiar with, methods employed by narcotics

organizations to thwart detection by law enforcement, including the use of debit calling cards, cellular telephones, counter surveillance, false or fictitious identities, and encoded communications.

3.    Prior to my employment as a Special Agent with the DEA, I was a Police Officer with the New York City Police Department for six and a half years.  In that role, I participated in the arrest and apprehension of numerous violent offenders as well as assisted in the swearing and execution of Search Warrants in and around New York City.

## II.   PURPOSE OF AFFIDAVIT

4.    This affidavit is made in support of an application for a warrant to search a Black iPhone 11 Pro, with Serial Number MWA62LL/A, and International Mobile Equipment Identity ("IMEI") C35CX86RN6XM (the "SUBJECT DEVICE"), that was seized on February 20, 2021, and is currently in the custody of the Costa Mesa Police Department ("CMPD") at its office in Costa Mesa, California, as described in Attachment A.

5.    The requested search warrant seeks authorization to seize any data on the SUBJECT DEVICE that constitutes evidence or fruits of violations of Title 21, United States Code, Sections 841(a)(1) (Distribution and Possession with Intent to Distribute Controlled Substances) and 846 (Conspiracy to Distribute Controlled Substances) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

6.    The facts set forth in this affidavit are based upon my observations, my training and experience, and information obtained from other law enforcement agents, officers, and investigators, and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  **SUMMARY OF PROBABLE CAUSE**

7.    The DEA and the CMPD are investigating the drug overdose death of 18-year-old Amonie Palmer ("Palmer").  On February 9, 2021, at 10:46 a.m., Palmer was found dead of an apparent drug overdose in the bathroom of her residence at the Harbor Dormitories of Orange Coast College ("Harbor Dormitories"), located at 1369 Adams Avenue, Room #3206, Costa Mesa, California 92626.  During the investigation into her death, Palmer's roommate told investigators that Daniel H. KIM ("KIM") was a drug dealer who was dating Palmer in the two weeks leading up to her death.  Based on the evidence obtained during the investigation, the DEA and CMPD believe that KIM supplied the drugs that resulted in the death of Palmer and evidence of this will be found in the SUBJECT DEVICE.

8.    Furthermore, in the weeks following the death of Palmer, CMPD officers were called to the Harbor Dormitories regarding a disturbance involving KIM.  Upon encountering KIM,

3

CMPD Officers conducted a probation search of KIM's person and found him to be in possession of drug paraphernalia.  Because this violated the terms of his probation, KIM was arrested and taken into custody by the CMPD.  During questioning, KIM consented to a search of the SUBJECT DEVICE where CMPD investigators uncovered text messages related to the acquisition and distribution of illicit drugs, predominantly in the Orange County area.

### IV.   <u>STATEMENT OF PROBABLE CAUSE</u>

9.   Based on my training and experience, as well as conversations with other agents, detectives, and officers involved in this investigation, I am aware of the following information related to this investigation.

**A.   Death of Amonie Palmer**

10.   On or about February 9, 2021, CMPD received a report that a woman had overdosed in Room #3206 of the Harbor Dormitories in Costa Mesa, California.  Upon arrival, responding officers discovered Palmer unresponsive, lying face-up on the bathroom floor.  The Costa Mesa Fire Department attended to Palmer who was later pronounced dead at 10:46 a.m.

11.   CMPD investigators reviewed surveillance video, which showed Palmer and KIM walking around the Harbor Dormitories of Orange Coast Community College, where Palmer resided, on the night before her death.  In the surveillance footage, which I have reviewed, Palmer appeared to be under the influence of an unknown substance and was unsteady on her feet, seeming to require aid to walk down the corridors.  In the surveillance

video, at approximately 12:37 a.m. on February 9, 2021, KIM is seen leaving Palmer at her room, where she was later found dead of an apparent drug overdose.[1]

12.   During the investigation, Daja Banks ("Banks"), roommate and cousin of Palmer, showed CMPD investigators Snapchat videos where KIM advertised the sale of illicit opiates such as Xanax and Percocet.  Banks stated that KIM had been distributing fentanyl, Percocet, and Xanax pills, predominantly to the students of Orange Coast Community College, and that KIM and Palmer were dating in the weeks preceding Palmer's death.

**B.    Report of a Disturbance by KIM**

13.   On February 20, 2021, CMPD was again called to the Harbor Dormitories.  Upon arrival, CMPD made contact with the individual who called law enforcement.  The reporting party stated that KIM was shouting outside of their dorm room.  The reporting party further stated that KIM had a history of selling drugs, including fentanyl, and that he was in room #1228.  CMPD Officers knocked on the door at room #1228 and KIM answered and identified himself.  At the time, KIM was holding his cell phone, which was later determined to be the SUBJECT DEVICE. When KIM was asked to step outside to speak with the officers, he dropped the SUBJECT DEVICE on the floor inside the apartment.

14.   Based on KIM's probation status, which included search terms for his person and residence and was known by the officers based on a previously run records check, officers conducted a

---

[1] The toxicology report for Palmer's death is currently pending.

Case 8:21-mj-00319-DUTY *SEALED*   Document 2 *SEALED*   Filed 05/05/21   Page 16 of 23
Page ID #:61

probation compliance check on KIM.  Officer Ashby of the CMPD observed a "tooter" sticking out of KIM's right-rear pants pocket.  I know, based on my training and experience, that a "tooter" is a straw used to inhale narcotics fumes -- usually off of tinfoil.  The possession of drug paraphernalia was in direct violation of KIM's terms of probation, which the officers knew based on the review of his probation terms.

15.  CMPD also conducted a probation search of the common area of KIM's dormitory and his room.  Inside KIM's bedroom, CMPD found an Altoids box containing a small clear plastic baggie containing what appeared to be 48 green Xanax bars, along with various other prescription drugs.[2]  The nightstand also contained a "tooter" with burnt drug residue.  None of the pills in the Altoids box had a corresponding prescription.  CMPD discovered several other pill bottles in KIM's room that were prescribed to KIM and were contained in regular medicine bottles.  When asked about the pills in the Xanax bottle, KIM stated that the pills were prescribed to him.

16.  KIM was then arrested for Possession of Unlawful Drug Paraphernalia, in violation of California Health and Safety Code § 11364(a) and Possession of Controlled Substances without a Prescription, in violation of California Business and Professions Code § 4060 and taken to the Costa Mesa Police Department for booking.  There, CMPD investigators read KIM his Miranda Warnings, which he waived verbally and agreed to speak with the investigators.

_____

[2] Drug testing of the pills is currently pending.

17.   During the interview, KIM denied selling Xanax or
drugs to anyone and denied having anything to do with Palmer's
death.  At one-point in the interview officers asked for consent
from KIM to search the SUBJECT DEVICE.  KIM provided CMPD
consent to search his phone and provided his passcode.  Although
he denied selling drugs, KIM said he still gets "hit up" on his
phone by his old friends for Percocet pills.

18.   CMPD Officer Luczkiewicz reviewed the SUBJECT DEVICE,
per KIM's consent, and saw numerous text messages related to the
acquisition and distribution of narcotics.  Message threads were
uncovered between KIM and other buyers and narcotics
distributors within the Orange County area.

19.   For example, Officer Luczkiewicz observed the
following conversation on the SUBJECT DEVICE, dated February 20,
2021, between an unidentified narcotics purchaser known only as
"RYAN" and KIM using the SUBJECT DEVICE:

a.   RYAN: Yo.

b.   KIM: U need more xans g? Im running low so hmu
ASAP.

c.   RYAN: I need blues but I`m stuck at the crib.

d.   KIM: I gotchu.

20.   Based on my training and experience, as well as my
knowledge of this investigation, I know that the term "blues" is
often used as a slang term for oxycodone or counterfeit
oxycodone pills.  I further know that "xans" is a slang term for
Xanax bars (a brand name of alprazolam) or counterfeit Xanax
bars.  Both oxycodone and alprazolam are prescription-controlled

substances that are commonly abused and sold illegally.  Based
on this, I believe in this text message conversation, KIM was
attempting to sell "Ryan" Xanax bars or counterfeit Xanax bars
and "Ryan" instead asks to purchase oxycodone or counterfeit
oxycodone pills.

21.  Officer Luczkiewicz also observed a Snapchat account
linked to the SUBJECT DEVICE named "@lildshop" that appeared to
be used by KIM to advertise the sale of controlled substances.
Specifically, the following conversation took place over
Snapchat on February 15, 2021, between KIM and a subject known
only as "Danny":

     a.   KIM: If you know anybody that needs real Xanax
I'm on deck with the all day; You shoot me clients I'll break
you bread.

     b.   DANNY: Bet I'll do share for share.

     c.   KIM: Bet bet.

22.  Additionally, KIM had another conversation over
Snapchat with Jared Lexa Allnut on February 20, 2021, which
detailed the following transaction:

     a.   KIM: U need xans?

     b.   ALLNUT: yeah I'm trying to get money.

23.  When confronted with text messages on his phone, KIM
admitted to selling Xanax to people who had prescriptions.

24.  Based on my training and experience, I believe that in
the above Snapchat conversations, KIM told two people that he
had Xanax available for sale.

>    C.    **Additional Reports of KIM Selling Drugs at Orange**
>
>          **Coast College**

25.    In the days following Palmer's death, CMPD Detective
Josef Saar documented two reports of KIM offering drugs to
individuals at Orange Coast College.  On February 16, 2021, a
student/resident reported to community assistants at the college
that her roommate was spending time with KIM and she believed
her roommate was on drugs.  In the report, the resident stated
that KIM had offered pills to people on campus, including 18-
year-old girls.

26.    In another report, CMPD Detective Saar reported that
on February 19, 2021, he received an email from Orange Coast
College Community Assistant Katie Pratt, who reported that a
student, while in KIM's dorm room, observed KIM produce an
Altoids container containing blue and green pills that the
student recognized as Xanax.  KIM told the student that that the
pills were "stronger" than normal and that the blue pills were
"cut with fentanyl."  The student said that she saw KIM's
Snapchat account, which showed the screenname of the individual
that supplied drugs to KIM as "@yungfetti2k."  Based on my
training/experience, I know that "fetti" is a term used for
fentanyl.  The student also told the community assistant that
KIM's Snapchat account was "@lildshop."  The community assistant
took photographs of the Snapchat accounts and then forwarded
them to Detective Saar.

27.    Based upon the above information, I believe there is
probable cause that the charged offenses have been committed and

furthermore that evidence of their commission will be found on
the SUBJECT DEVICE.

### V.   TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING

28.   Based upon my training, experience, knowledge of this
investigation, and conversations with other experienced
narcotics investigators, I know that drug traffickers often
communicate with their criminal associates using telephones,
cellular telephones, pre-paid telephones, and computers, and
these digital devices often contain information such as contact
numbers, messages, or other records that are relevant to the
commission of criminal offenses.  Drug traffickers often use
multiple phones to conduct their narcotics-related activities,
to isolate drug suppliers from customers and associates and from
other members of their drug trafficking organization.  Drug
traffickers also often store evidence of their criminal activity
on cellular phones, personal data assistants, or other digital
devices, such as smart phones, in forms that may be as simple as
customer lists or as elaborate as banking data tracking deposits
from narcotics-related transactions.  In light of the universal
popularity of hand-held electronic devices, narcotics
traffickers often utilize them to generate, transfer, count,
record and/or store all types of information relating to drug
trafficking and any other illegal activities.  In particular,
"smart" hand-held electronic devices, such as the device at
issue in this affidavit, can be used to store data and send and
receive data and messages.

29.  Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

30.  As used herein, the term "digital device" includes the SUBJECT DEVICE.

31.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been

11

used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

     c.    The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

     d.    Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

  32.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it can take a substantial period of time to search a
digital device for many reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.   Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.   As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

33.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

34.   Based on the aforementioned, I believe there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses will be found on the SUBJECT DEVICE, as described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of <u>Fed. R. Crim. P. 4.1</u> by
telephone on this <u>5th</u> day of May
2021.

_Karen E. Scott_
_____
HONORABLE KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE